THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* DUANE MEDDOWS, Defendant-Appellee.

Fifth District   No. 77-248

Opinion filed December 28, 1978.

G. MORAN, P. J., dissenting.

Clyde L. Kuehn, State's Attorney, of Belleville (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

James J. Gomric, of Gomric and Strellis, of Belleville, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

This is an appeal by the State pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1977, ch. 110A, par. 604(a)(1)) from an order of the trial court suppressing certain statements of the defendant and

physical evidence seized from the trunk of his car. The suppression was ordered on the basis of the court's finding that these items of evidence were the "fruits" of a prior custodial interrogation that was not preceded by advising defendant of his constitutional rights in accord with *Miranda v. Arizona* (1966), 384 A.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

The question on appeal is whether the suppressed evidence is sufficiently connected to any illegality so as to require its suppression, that is, whether it "has been come at by exploitation" of the interrogation that occurred without benefit of *Miranda* warnings (*Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455-56, 83 S. Ct. 407, 417). We find that it has not.

From the record, it appears that at approximately 7 a.m., August 27, 1976, Cletus Meddows, the father of defendant Duane Meddows, was killed by the detonation of an explosive device while on a hunting expedition near Freeburg, Illinois, with defendant. An examination of the scene turned up two extremely wet packets of unexploded dynamite and sundry paraphernalia associated with the setting of explosive charges. The code numbers which this dynamite bore traced it to pit six of the River King coal mine where defendant was employed as a dynamite shooter.

On August 29, defendant was questioned by two law enforcement officers. During this questioning, defendant admitted stealing dynamite from the mine and consented to a search of his car. The search of the trunk of his car produced tools of the type needed to rig an explosive device, tape matching that found around the packets of dynamite and a cardboard box from which a piece had been cut. The State represented to the trial court that it had an expert who would testify that a three-inch by six-inch piece of cardboard used as part of the explosive device was cut from the box found in defendant's car.

The defendant was formally charged with murder in connection with the dynamite slaying. He subsequently filed a motion to suppress statements and two motions to suppress evidence, one of which was directed at the items found in the car's trunk. Following a hearing on the motion to suppress statements, at which the only testimony presented was that of the interrogating officers, the court suppressed the defendant's admission and the items seized from his car. The State brought this appeal.

At the hearing on the motion to suppress, the following pertinent information was adduced.

On August 29, 1976, David True, a special agent with the Federal Bureau of Alcohol, Tobacco and Firearms, and Deputy William Hopkins of the St. Clair County Sheriff's Department went to a particular funeral home where defendant was located for the purpose of asking him to

come with them to the county sheriff's office for questioning concerning his father's death. He was the chief suspect in the case at that time because of information which their investigation had revealed, including the facts: that defendant was employed at a coal mine as a dynamite shooter; that he was one of three people at the mine who had access to dynamite; that the same type dynamite and materials used at the mine were employed in the crime; that defendant was the victim's son; and that defendant and the victim were together on a hunting trip when the victim was killed.

When the officers met defendant at the funeral home, they told him that he did not have to go with them but that they would like for him to come with them to the station for questioning. The defendant voluntarily agreed to accompany them; however, if he had refused, the police would have sought to obtain an arrest warrant or a subpoena in order to gain access to him for questioning. The officers drove defendant to the sheriff's office in a police car. They arrived there at 1:45 p.m. and began questioning him in an interrogation room without giving him his *Miranda* warnings. The defendant was questioned for 1½ hours before he was advised of his *Miranda* rights at 3:15 p.m., after which he was questioned some more. At no time during this initial questioning period was defendant told that he was free to leave if he wanted to. However, if he had insisted on being returned to the funeral home, the officers would have complied since he was not then under arrest.

The police used the initial questioning period both to verify information they already had and to obtain new information. During the period before defendant was advised of his rights, he was questioned concerning his activities on the day before the incident (when the device may have been planted), his duties at the mine and in his previous military service, his financial status and his living arrangements. In an attempt to establish the existence of a financial motive for the crime, the officers inquired about his father's life insurance policies and asked defendant in whose names any family property was listed. Also during this time, the police determined that the car which defendant owned was a 1975 Oldsmobile 98.

In anticipation of interrogation with respect to the incident itself, the officers thoroughly admonished defendant of his *Miranda* rights at 3:15 p.m. by reading them to him from a prepared form. They then had him read the form. The defendant indicated that he understood his rights and then signed a waiver of rights provision that was witnessed by the officers. Defendant subsequently admitted stealing some dynamite from the mine and consented to a search of his car, the location of which had been revealed at some point in the interrogation. (It was not established whether the location of the car was revealed prior to or after the giving of *Miranda* rights.) After admitting the theft, defendant was no longer free

to depart, but he was not booked for murder until much later in the evening after a consent search of his living quarters had been made.

■■ It is well settled that one must be informed of his *Miranda* rights only before law enforcement officers initiate a custodial interrogation. (*Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711; *People v. Clark* (1977), 55 Ill. App. 3d 496, 371 N.E.2d 33.) In *Miranda*, the Supreme Court defined "custodial interrogation" as:

> " * * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.

The trial court found that defendant was the subject of a custodial interrogation from the very first moment he was questioned. The evidence suppressed, however, was not obtained before he was advised of his rights and was not excluded by direct application of the exclusionary rule of *Miranda*. Rather, it was excluded as the fruits of the questioning which took place before defendant was given his *Miranda* warnings pursuant to the "fruit of the poisonous tree" doctrine discussed in *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407. The order of the trial court, however, does not indicate in what way the suppressed evidence was "come at by *exploitation*" (emphasis added) of the asserted illegal questioning (*Wong Sun*, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417).

The State contends in this appeal that the defendant was not "in custody" during the questioning which preceded the giving of his *Miranda* warnings and cites *Oregon v. Mathiason* in support of its contention. Our research has revealed several Illinois cases in which reviewing courts have found by application of *Mathiason* that the defendant was not entitled to warnings prior to being interrogated. See *People v. McCue* (1977), 48 Ill. App. 3d 41, 362 N.E.2d 760; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Varney* (1978), 58 Ill. App. 3d 70, 373 N.E.2d 1033.

On the other hand, the defendant contends that the court's finding of custodial interrogation was not against the manifest weight of the evidence, emphasizing the factors presented here which Illinois courts have found relevant in assessing whether a custodial interrogation has occurred (*e.g.*, the amount of knowledge possessed by the police at the time of the interrogation, the tone and method of questioning, and who, if anyone, was the focus of the investigation at the time of the interrogation and the place in which the questioning takes place; *People v. Dunn* (1975), 31 Ill. App. 3d 854, 860, 334 N.E.2d 866, 871, *cert. denied* (1976), 426 U.S. 950, 49 L. Ed. 2d 1187, 96 S. Ct. 3171; *People v. Snow* (1976), 39 Ill. App. 3d 887, 350 N.E.2d 875).

Our examination of the record convinces us that a close question is presented as to whether the initial questioning was a custodial interrogation. There are numerous facts supportive of either conclusion.

In *Oregon v. Mathiason* the Supreme Court found that *Miranda* warnings were not required to be given before the interrogation of Mathiason since he was not in custody "or otherwise deprived of his freedom of action in any significant way." The court concluded that there was no indication that the questioning took place in a context where defendant's freedom to depart was restricted in any way, emphasizing that defendant appeared voluntarily at the police station, that he was informed that he was not under arrest and that defendant left the police station without hindrance at the interviews conclusion. (429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.) The court went on to state:

> " * * * [P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.

There are points of similarity between this case and *Mathiason.* Although Meddows was not told that he was free to leave while at the sheriff's office, he had reason to believe that he was not under arrest and that such an alternative was available to him since he was initially informed that he did not have to accompany the officers. The record also reflects that he went voluntarily with the officers to the sheriff's office.

However, unlike *Mathiason,* defendant's actual freedom to depart was never demonstrated. He was arrested during the questioning. In addition, several of the factors which our courts have considered relevant in distinguishing between custodial and investigative interrogation or the time when, absent formal charge or arrest, custody of a defendant is established are present here. (See *People v. Dunn; People v. Snow.*) First, the information in the possession of the interrogating officers at the time of the questioning was probably sufficient to establish probable cause to arrest defendant. In fact, agent True indicated that had defendant refused to go with them he would have sought to obtain an arrest warrant. Second, the tone of the initial questioning might be considered accusatory rather than merely investigatory; part of the interrogation was used to probe for a financial motive on defendant's part for his father's death. Third, the focus of the investigation was obviously upon the defendant at the time of the interrogation. He was the only person with access to the dynamite used in the crime who had any connection to the victim.

However, this court is of the opinion that a determination as to whether the initial questioning was a custodial interrogation is not necessary. Even if we were to assume that the interrogation were custodial, the suppression of the instant evidence would be error since it was not "come at by exploitation of" the prior questioning.

When asserting the fruit of the poisonous tree doctrine, the burden is on the defendant in the first instance to establish the primary illegality and to show its connection to what are alleged to be the fruits of the illegality. (*People v. Wilson* (1975), 60 Ill. 2d 235, 326 N.E.2d 378; *People v. Robbins* (1977), 54 Ill. App. 3d 298, 369 N.E.2d 577.) The connection required is that the evidence "has been come at by exploitation of that illegality." *Wong Sun*, 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.

The defendant's position is that even though he was scrupulously advised of his constitutional rights and waived them before he admitted the theft of dynamite and gave his consent to a search of his car, the admission and consent were not voluntary but rather were obtained by exploitation of defendant's previous answers that he was a dynamite shooter and owned a 1975 Oldsmobile 98 automobile. The trial court apparently agreed with this theory.

▮▮ After due consideration, we find that we must reverse the trial court's order of suppression.

The fruit of the poisonous tree doctrine is simply not appropriate to these facts. The defendant's theory ascribes much import to defendant's answers that he worked as a dynamite shooter and that he owned a particular automobile. He asserts that these answers compelled him, after being scrupulously advised of his rights against self-incrimination, to consent to a search of his car and to admit a theft of dynamite. We believe that these answers are incapable of being exploited in the manner suggested. They are routine answers to routine questions, totally devoid of any compulsion to induce a confession or any other type of self-incrimination by demonstrating the futility of remaining silent. (*Cf. People v. Robbins.*) We note in this regard that the claimed import of these answers is not supported by the record in that the defendant, after receiving the warnings, denied any responsibility for the death of his father.

Furthermore, in view of the fact that the officers knew prior to any questioning that defendant was employed as a dynamite shooter, that a car was observed near the scene of the crime the night before the explosion and that the defendant owned a car, it is highly likely that they would have sought, after advising defendant of his rights, to obtain consent to search his car and to inquire about his possession of dynamite belonging to the coal company regardless of his answers to the preliminary questions. This being the case, the weakness of the link

between the suppressed evidence and defendant's prior answers is further demonstrated. Although the location of the car might have been obtained before defendant was advised of his rights, we do not believe that that fact alone could make the defendant's consent a fruit of the previous questioning.

Of primary importance to our decision is the fact that defendant was thoroughly admonished of his *Miranda* rights before his admission and consent were obtained. In addition, the illegality, if any, on the part of the officers does not amount to a flagrant misconduct. (See *People v. Robbins* and *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.) They merely obtained answers to some routine questions without first giving defendant his *Miranda* warnings. As has already been noted, the answers of defendant to which our attention has been drawn do not have the capacity to induce a subsequent self-incrimination.

For the foregoing reasons, we reverse the suppression order of the circuit court of St. Clair County and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded.

KARNS, J., concurs.

Mr. PRESIDING JUSTICE GEORGE J. MORAN, dissenting:

Prior to stating my reasons for dissenting in this cause, I wish to call attention to some inaccuracies in the majority opinion. The majority says that "even though he [defendant] was scrupulously advised of his constitutional rights and waived them * * *." I have examined appellee's brief carefully and find no such concession.

The opinion also states that when asserting the fruit of the poisonous tree doctrine the burden is on the defendant in the first instance to establish the primary illegality and to show its connection to what are alleged to be the fruits of the illegality, citing *People v. Wilson*, 60 Ill. 2d 235, and *People v. Robbins*, 54 Ill. App. 3d 298. This is an inaccurate statement of the law enunciated in these two cases. The rule of law stated in those two opinions is that once the defendant establishes the primary illegality and shows its connection to what are alleged to be the fruits of the illegality, the prosecution then has the burden of establishing by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. This, to me, means that the test enunciated was to require the accused to establish the primary illegality and make a prima facie showing of the connection and upon the showing of that prima facie connection the

burden is shifted to the prosecution to prove the contrary by clear and convincing evidence. Compare *Harrison v. United States*, 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008.

After hearing testimony offered by the State on the defendant's motion to suppress confession, the court found that the defendant was "in custody" within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and therefore all statements obtained from the defendant prior to the time proper warnings were given were inadmissible. The court also suppressed as fruit of the poisonous tree all statements made by the defendant immediately after warnings were given and certain physical evidence obtained from the defendant's car.

The law is clear that the ruling of a trial judge on a motion to suppress confession will not be reversed on appeal unless it is against the manifest weight of the evidence, since he is in the best position to determine the credibility of the witnesses and the competency of the confession. (*People v. Young*, 131 Ill. App. 2d 113, 266 N.E.2d 160.) This is true whether the motion involves a confession or merely admissions. *People v. Mrozek*, 52 Ill. App. 3d 500, 367 N.E.2d 783.

The trial court after hearing the witnesses on the motion to suppress concluded that the defendant was in custody when they first took him to the station. I agree. The investigation had focused upon him, he was in the type of setting described in *Miranda* and he was not free to leave. In any event, there was sufficient evidence for the trial court so to find and this finding is binding on us if supported by the evidence, which it was.

Therefore, in my opinion we should commence with the fact that the defendant was in custody when he first was taken into the station and that he was entitled to the *Miranda* warnings before any interrogation began. The reasoning of the majority impels this conclusion, but it ducks the question.

The reasoning of the trial court and the argument of counsel for the defendant was and is that all of the statements taken after the *Miranda* warnings were given were inadmissible because of the fruit of the poisonous tree doctrine. This position is wrong. In fact, it is so wrong that I do not think the case should be based upon this issue even though argued before us. When there has been an uninterrupted interrogation with no *Miranda* warnings given at the beginning of the interrogation, and where *Miranda* warnings are given at a time later on in the interrogation, I have never heard of an argument that the latter part of the statement must be suppressed under the "fruit of the poisonous tree doctrine." If it is to be suppressed, it must be done under the principles laid down in *Miranda*. In *Miranda* the Supreme Court pointed out that if authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from

doing so without violating the person's *fifth amendment* privilege so long as they do not question him during that time. The court further stated that if the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

From the foregoing I conclude that the statement as a whole was in violation of the principles enunciated in *Miranda* and therefore the statement was involuntary. In my opinion the trial court was correct in suppressing the statement but not for the reason enunciated, *i.e.*, that it was the fruit of the poisonous tree, but for the reason that I have previously stated. The court in its order said:

"There can be no question that this questioning took place while Defendant was in custody. The Defendant was the prime suspect in this case. He was taken by the police from a funeral home to the County Jail. He was not advised for an hour and one-half that he did not have to talk to these officers. He was not advised that he could leave at any time he wanted. He was not advised that he was not under arrest and was not advised that the investigation into his father's homicide was focusing on him.

Under the totality of the circumstances Defendant's Constitutional rights were violated when the police failed to advise him of his rights before questioning for the period in question."

I think the following language from *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, is particularly appropriate to the actions of the two police officers in this case:

"The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' [Citation.] The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.

I would affirm the order of the trial court.